**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-2304

KENNETH GROSS; LAUGHTON ESTATE TRUST,

Plaintiffs - Appellants,

versus

SES AMERICOM, INCORPORATED; COLUMBIA
COMMUNICATIONS CORPORATION,

Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt. Roger W. Titus, District Judge. (CA-03-
102-RWT)

Argued: September 20, 2006        Decided: January 11, 2007

Before WILLIAMS and TRAXLER, Circuit Judges, and Henry F. FLOYD,
United States District Judge for the District of South Carolina,
sitting by designation.

Affirmed by unpublished opinion. Judge Williams wrote the majority
opinion, in which Judge Floyd concurred. Judge Traxler wrote a
dissenting opinion.

**ARGUED:** Mark Douglas Colley, HOLLAND & KNIGHT, Washington, D.C.,
for Appellants. Robert P. Parker, PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, Washington, D.C., for Appellees. **ON BRIEF:** Lynn E.
Calkins, Cameron W. Fogle, HOLLAND & KNIGHT, Washington, D.C., for
Appellants. Erika C. Birg, PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

WILLIAMS, Circuit Judge:

Kenneth Gross and Laughton Estate Trust appeal the district court's grant of summary judgment to SES Americom, Inc. on their breach of contract claim. For the following reasons, we affirm.

I.

Appellants Kenneth Gross and Laughton Estate Trust (collectively, Appellants) are the former owners of Columbia Communications Corporation (Columbia), which markets and leases international satellite capacity to telecommunications service providers. In early 2000, Appellants sold Columbia to GE Americom pursuant to a Merger Agreement. Thereafter, SES Global S.A. acquired GE Americom, and GE Americom changed its name to SES Americom.

Telecommunications satellites operate in a geosynchronous orbit above the earth's equator at locations determined by longitude. The electromagnetic spectrum used for satellite communications is divided into numerous frequency ranges, including the Ku-band, C-band, and Ka-band. A satellite may be licensed to operate within a particular band or on multiple bands as a "hybrid" satellite.

Prior to being acquired by SES Americom, Columbia sought to acquire a Federal Communications Commission (FCC) license that would permit it to operate a satellite in the Ku-band at the 47°

3

West Longitude (W.L.) orbital slot. At the time, Loral Orion Network Systems (Loral) held the FCC license to operate a Ku-band satellite at the 47° W.L. slot. Consequently, Columbia filed with the FCC a "Petition to Revoke" Loral's license, arguing that Loral had failed to meet certain obligations with the license. Columbia also applied to the FCC for its own license to construct, launch, and operate a Ku-band satellite at the 47° W.L. slot. These efforts were ongoing at the time Appellants sold Columbia to SES Americom, and because a 47° W.L. Ku-band license would be valuable to Columbia, Appellants entered into a First Letter Agreement (FLA) in connection with the Merger Agreement that entitled Appellants to receive additional compensation if Columbia obtained the license from the FCC. Columbia's efforts to have Loral's license revoked ultimately proved unsuccessful.

Because Columbia did not succeed before the FCC, the condition entitling Appellants to receive additional compensation was not met. Nevertheless, the FLA contained another provision that entitled Appellants to additional compensation if, through some other approach, SES Americom obtained a 47° W.L. Ku-band license. FLA § B.5(b) entitled Appellants to an additional $10 million if, by September 1, 2003, SES Americom filed with the FCC an

4

application for a license to operate a Ku-band satellite at the 47°
W.L. orbital slot, and the FCC ultimately granted that license.[1]

In April 2003, Appellants pursued a new tactic to get Loral's
47° W.L. Ku-band license transferred to SES Americom, which would
thereby entitle Appellants to the additional $10 million. Without
SES Americom's knowledge, Appellants approached Loral with an offer
to buy Loral's Ku-band license so that they could transfer it to
SES Americom.[2] Appellants initially offered Loral $300,000 for the

[1]First Letter Agreement § B.5(b) states,
> [T]he [Appellants] shall be entitled to receive an
> Additional Ku-band Amount [$10 million] for a Qualifying
> Ku-band Order granted to [SES Americom] by the FCC, . .
> ., if on or before the Subsequent Ku-Band Rights Date .
> . .: (I) following issuance of a Qualifying Ku-band
> Order, neither the FCC nor any other party seeks
> reconsideration or review of that order within the
> applicable periods and such order becomes a Final Order;
> or (ii) if upon completion of the first level of judicial
> review of the Qualifying Ku-band Order which is a
> dispositive determination, the order is a Qualifying Ku-
> band Order, regardless of whether any other party seeks
> further reconsideration or review.

(J.A. at 447-48.) A "Qualifying Ku-band Order" is "an order that
grants [SES Americom] Permanent Authority to make use of
commercially usable Ku-band spectrum at 47° W.L." (J.A. at 448.)
The "Subsequent Ku-Band Rights Date" is the third anniversary of
the closing date of the Merger Agreement -- September 1, 2003.
(J.A. at 449.) The filing of an application with the FCC stayed
the September 1 deadline until the FCC granted or denied the
application.

[2]A FCC rule change facilitated Appellants' new approach. The
old FCC rules restricted Loral from selling its bare 47° W.L. Ku-
band license for a profit. In May 2003, the FCC released new rules
that eliminated this restriction; this rule change did not become
effective until August 27, 2003.

5

license, although Appellants had agreed on an opening offer as high as $500,000.

Loral was interested in Appellants' proposed deal, but Loral had a significant commercial relationship with SES Americom that it did not want to disrupt and was therefore concerned about SES Americom's reaction to the deal. As a result, Loral insisted that Appellants obtain SES Americom's approval of the deal before continuing with negotiations.

To assuage Loral's concerns, on May 6, 2003, Appellants drafted a proposed letter on behalf of SES Americom and sent it to SES Americom for its approval. The letter, which was addressed to Loral's President, stated that SES Americom "would support" Appellants' purchase of the license from Loral and "would participate" in the necessary FCC filings to transfer the license. (J.A. at 608.) SES Americom declined to approve the letter.

On July 15, 2003, Loral filed for bankruptcy protection. Consequently, any transfer of Loral's 47° W.L. Ku-band license after that date would have required the bankruptcy court's approval.

On July 16, 2003, Appellants sent SES Americom another letter. This letter noted that Appellants were "prepared to undertake all steps necessary to accomplish this transfer, including completion of negotiations with and payments to Loral," but that SES Americom had not indicated any willingness to cooperate with the transfer.

6

(J.A. at 609-610.) Appellants enclosed with the letter a FCC transfer application that they had filled out to effectuate the transfer of Loral's license to SES Americom. The letter asked SES Americom to sign the FCC transfer application and stated that Appellants would "then complete [their] efforts to secure Loral's signature and prepare the application for filing." (J.A. at 610.) SES Americom never responded.

Appellants' proposed deal with Loral never progressed, and on September 1, 2003, their rights under FLA § B.5(b) to receive $10 million expired. Appellants thereafter sued SES Americom for failing to consent to a transfer of Loral's 47° W.L. Ku-band license, thereby blocking fulfillment of the condition in FLA § B.5(b) that would have entitled Appellants to $10 million. Appellants argued that fulfillment of the condition should be excused and that they were entitled to receive the $10 million because SES Americom blocked fulfillment of the condition.

On cross-motions for summary judgment, the district court denied Appellants' motion and granted SES Americom's motion. In an oral ruling, the district court rejected the Appellants' arguments that they were entitled to $10 million under the terms of FLA § B.5(b), concluding, inter alia, that SES Americom's actions did not prevent the transfer of the Ku-band license. The district court noted that Appellants engaged only in "tentative and preliminary discussions" with Loral and that Loral and Appellants

7

were "substantially at odds with each other" over the price of the license, with Appellants having agreed on a maximum of $500,000 as an opening offer and Loral Orion expecting a minimum of $1 million. (J.A. at 325.) The district court found that many obstacles stood in the path of a completed purchase, such as the parties' agreement on a sale price, the bankruptcy court's approval of the sale of the license, and the FCC's transfer of the license. The district court also concluded that SES Americom did not violate its contractual obligations by refusing to sign the transfer application when there had been no agreement reached with Loral.

Appellants timely noted an appeal. We have jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).

## II.

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Laber v. Harvey, 438 F.3d 404, 415 (4th Cir. 2006) (en banc) (quoting Fed. R. Civ. P. 56(c)). We review de novo the district court's grant of summary judgment, viewing the facts in the light most favorable to the non-moving party. Id. According to the parties' agreement, New York law governs the contractual provisions of the FLA.

A.

Under the terms of the FLA § B.5(b), if the FCC issued the 47° W.L. Ku-band license to SES Americom within the specified time frame, Appellants were entitled to an additional $10 million payment from SES Americom. Section B.5(b) therefore created a condition precedent to SES Americom's obligation to pay: the FCC's grant of a Ku-band license to SES Americom. See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (N.Y. 1995) ("A condition precedent is an act or event . . . which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." (internal quotation marks omitted)); 13 Williston on Contracts § 38:7 (4th ed. 2006) ("A condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises."). The FCC never issued a Ku-band license to SES Americom, so the condition precedent was never fulfilled.

Despite the nonfulfillment of the condition precedent, SES Americom could be obligated to pay Appellants if it violated its contractual duties under New York's doctrine of prevention. This doctrine imposes on SES Americom, the conditional promisor, an "implied obligation . . . not to do anything which [would] have the effect of destroying or injuring the right of the [Appellants] to receive the fruits of the contract." A.H.A. Gen. Constr., Inc. v.

9

New York City Hous. Auth., 699 N.E.2d 368, 374 (N.Y. 1998) (internal quotation marks omitted). Under the prevention doctrine, SES Americom "cannot rely on the failure of [Appellants] to perform a condition precedent where [SES Americom] has frustrated or prevented the occurrence of the condition." Id. (internal quotation marks omitted). In other words, SES Americom cannot act to prevent fulfillment of FLA § B.5(b) to avoid paying Appellants $10 million.

For SES Americom to be liable under FLA § B.5(b) despite nonfulfillment of the condition precedent, SES Americom must have caused the nonfulfillment. See Amies v. Wesnofske, 174 N.E. 436, 438 (N.Y. 1931) (stating that the prevention doctrine applies when the promisor "is the cause of the failure of performance of a condition [precedent]" (emphasis added)); Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 501 (2d Cir. 1989) ("'It is a well settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself.'" (emphasis added) (quoting Young v. Hunter, 6 N.Y. 203, 207 (1852))); see also 22A N.Y. Jur. 2d Contracts § 377 ("If a promisor prevents or hinders the occurrence of a condition, and the condition would have occurred except for such prevention or hindrance, the condition is excused or waived." (emphasis added)).

Moreover, even if SES Americom had caused nonfulfillment of the condition, the condition precedent of FLA § B.5(b) is not

10

automatically waived simply because SES Americom blocked it. "There are . . . 'some cases in which some sort of prevention or interference is contemplated by the parties as quite proper and within the privileges of the promisor.'" Cross & Cross Props., 886 F.2d at 502 (quoting 3A A. Corbin, Corbin on Contracts, § 767, at 545 (1960)). Thus, for the condition precedent of FLA § B.5(b) to be excused, SES Americom "must have blocked the condition 'through a breach of the duty of good faith and fair dealing.'" Id. (quoting Restatement (Second) of Contracts § 225 comment b); see also id. (noting that "[c]ourts applying New York law repeatedly have recognized the duty of good faith and fair dealing" in contractual obligations). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Id.

B.

In this case, assuming that SES Americom was contractually obligated to give its consent to Appellants' purchase of the license from Loral, SES Americom did not cause the nonfulfillment of the condition precedent of FLA § B.5(b).

1.

Loral told Appellants that it would not be interested in negotiating for the purchase of the license unless Appellants obtained SES Americom's approval of the proposed transaction.

11

Appellants contend that SES Americom twice refused to provide its consent to the proposed transaction, thereby preventing fulfillment of the condition precedent.

Appellants first attempt to secure SES Americom's consent to the proposed transaction occurred in the May 6, 2003, draft letter that Appellants sent to SES Americom for its signature. The letter attempted to show SES Americom's consent by stating that SES Americom "would support" Appellants' purchase and "would participate" in the necessary FCC application to transfer the license. (J.A. at 608.) Although SES Americom did not sign the letter, its failure to sign the letter did not prevent the proposed transaction from coming to fruition, because Loral stated that if it had received the letter it would have asked for a "more explicit statement that SES Americom . . . supports this transaction." (J.A. at 2299.) Thus, SES Americom's failure to sign the draft letter did not prevent fulfillment of the condition precedent because this letter was insufficient to meet Loral's concerns and thereby enable negotiations to proceed.

2.

The second attempt to secure SES Americom's consent to the proposed transaction occurred when Appellants sent SES Americom the letter and FCC transfer application on July 16, 2003, the day after Loral filed for bankruptcy. Appellants had filled out the transfer application with the required information but needed SES Americom

12

and Loral to execute the application. Appellants informed SES Americom that if it would execute the transfer application, Appellants would then complete negotiations with Loral for the purchase of the license. SES Americom never responded.

We agree with the district court that FLA § B.5(b) did not obligate SES Americom to execute the transfer application at the time that Appellants presented it to SES Americom. As the district court described, Appellants were asking SES Americom "to sign in a blank application to transfer the license," with SES Americom "not knowing whether Loral . . . was going to sign it, not knowing if [the application was going to be filed], [and] not knowing if it was going to go anywhere . . . ." (J.A. at 326.) To be sure, Loral clearly indicated that it would not negotiate with Appellants over the license unless SES Americom gave its consent to the transaction. In this second attempt, however, Appellants did not merely ask SES Americom to consent to the transaction; rather, Appellants asked SES Americom to execute a legal document before a deal with Loral had been reached. SES Americom did not breach its duty of good faith and fair dealing by refusing to sign a transfer application before Loral had agreed to sell the license.

Moreover, we agree with the district court's conclusion that SES Americom's refusal to execute a blank transfer application did not prevent fulfillment of the condition precedent. If SES Americom had signed the transfer application, Appellants would then

13

have proceeded with negotiations with Loral, but there were several required, unfulfilled steps preventing the transaction. First, there was a substantial difference in the amount ($300,000) that Appellants offered for the license and the minimum amount (at least $1 million) that Loral was willing to accept. Thus, negotiations would have been required to reach an agreement on price. Second, even if they had agreed on price, Appellants had been negotiating with Loral's President, who lacked authority to approve the transaction. Approval by Loral required consultation with Loral's chief executive officer and possibly authorization by Loral's board of directors. At deposition, Loral's president stated that this "wasn't a transaction that [he] actually thought was ever going to come to fruition." (J.A. at 2292.) Third, because Loral had entered bankruptcy, any sale of Loral's assets, such as the license, would have required the bankruptcy court's approval. Appellants' own bankruptcy expert noted that the bankruptcy rules require that creditors receive a minimum of twenty days notice before property of the debtor may be sold. Finally, the transfer application had to be filed with the FCC. Unless all of these required steps were completed between July 16 and September 1, 2003, the condition precedent in FLA § B.5(b) could not have been fulfilled. We therefore cannot say that it was SES Americom's refusal to execute the transfer application that prevented fulfillment of the condition precedent. Because SES Americom did

14

not cause the nonfulfillment of FLA § B.5(b), the condition precedent is not excused under New York's prevention doctrine.[3]

## III.

Because SES Americom did not cause the nonfulfillment of the condition precedent, it is not contractually liable under New York law. We therefore affirm the district court's grant of summary judgment to SES Americom.

AFFIRMED

---

[3]Our good colleague in dissent believes that "appellants presented sufficient evidence to create a genuine issue of material fact as to causation." Post at 2. With upmost respect, we disagree and briefly note two grounds supporting the district court's grant of summary judgment to SES Americom.

First, as we have described in the text, the May 6, 2003, draft letter was inadequate to address Loral's concerns, so SES Americom's refusal to sign that letter did not cause the condition precedent to remain unfulfilled.

Second, Appellant's next and final attempt to secure SES Americom's approval of the transaction required SES Americom to do more than indicate its approval. Appellants asked SES Americom to execute a transfer application -- a legal document -- before the deal with Loral had been finalized. Even if SES Americom's refusal to sign the transfer application caused nonfulfillment of the condition precedent -- a conclusion that we reject -- "a condition precedent is not automatically waived simply because the conditional promisor blocks the condition precedent." Cross & Cross Props., Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989). SES Americom would be liable only if it breached its duty of good faith and fair dealing, and we agree with the district court that SES Americom was not obligated to execute the transfer application.

15

TRAXLER, Circuit Judge, dissenting:

When appellants negotiated the merger of Columbia with GE Americom, both appellants and GE Americom were interested in obtaining Loral's 47º Ku-band license. Anticipating continuing pursuit of that license, GE Americom agreed to pay appellants an additional ten million dollars if appellants were able to obtain a qualifying Ku-band order from the FCC by September 1, 2003. Several months after the merger, however, GE Americom was acquired by SES Global SA, and GE Americom became SES Americom.

Relying on the still valid agreement of additional pay for obtaining the 47º Ku-band license, appellants continued their efforts to obtain Loral's license and began to make progress in their discussions with Loral. Because SES Americom was a potential customer, Loral wanted to make sure a deal with appellants would not anger SES Americom and so requested assurances that SES Americom had no objection to the license transfer. Unfortunately for appellants, SES Americom was not interested at all in a 47º Ku-band license, and when appellants approached it for a statement of support to Loral, SES Americom stonewalled and refused to assist appellants. Without some assurance that SES Americom would accept the license from Loral or participate in the processing of the FCC transfer application, appellants had no chance of completing the deal with Loral. Negotiations collapsed and appellants brought this suit against SES Americom.

16

In my view, appellants presented sufficient evidence to create a genuine issue of material fact as to causation. Four major hurdles evolved that appellants had to clear in order to obtain Loral's license: (1) willingness of Loral to sell, (2) agreement on price, (3) FCC approval of license transfer, and later (4) bankruptcy court approval.

Appellants' discussions with Loral's chief operating officer confirmed Loral's interest in selling. Although no specific sales price was agreed upon, an opening offer had been made by appellants, and Loral was keeping the door open for further negotiations. Loral was not using the 47º W.L. Ku-band license and the negotiations were occurring at a time when Loral was selling off assets in an effort to raise cash.

As to the necessary FCC approval, appellants provided a report from an expert in the communications field that it was "virtually certain" the Commission would have approved the transfer (J.A. 1109) and a bankruptcy expert gave a statement that "there is no reason why the [bankruptcy] court would not have considered and quickly approved the sale...." (J.A. 1159). While these approvals would have to be obtained quickly, when I view the evidence in the light most favorable to appellants, I see no overarching impediment to their being had in a timely fashion.

Loral never used the license and went into bankruptcy. No one ever bought the license at a bankruptcy sale. I think the

17

inferences are reasonable that Loral needed money and appellants were the only ones genuinely interested in buying the license. The only thing apparently preventing a transfer of the license was the refusal of SES Americom to indicate its approval. This, in my judgment, is sufficient to show that SES Americom's refusal to cooperate caused the loss to the appellants.